Long's Estate.

Argued October 29, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Robert A. Henderson* and *William G. Sitnek,* for appellants.

178

*Frank B. Warfel,* with him *B. F. Warfel,* for appellees.

OPINION BY KELLER, P. J., January 30, 1941:

Jeremiah Long died March 16, 1912, testate, leaving a widow and ten children. Letters testamentary were granted on March 22, 1912 to the executors named in his will, B. F. Long, R. B. Long and I. F. Long, three of his sons. No inventory and appraisement of his personal property was made until December 26, 1912, and it was not filed until February 20, 1913. It amounted to $10,367.94.

The inventory should have been confined to the personal estate of the decedent on the date of his death. The one filed included one item, No. 8, representing the proceeds of real estate, sold after decedent's death, and two items, Nos. 14 and 22, received in the course of their administration of the estate, to wit:

Item No. 8—Note of L. N. Long, a son, dated September 3, 1912, $1500.

Item No. 14—Note of Medora Ritchey, a daughter, and Joseph Ritchey, dated June 18, 1912, loan by executors out of money in bank, $400.

Item No. 22—Judgment note of Annie and James G. Long, dated June 1, 1912, entered to No. 420 March Term 1912, $600.

Item No. 8 represented a judgment note taken by the executors from L. N. Long—but never entered—as the purchase price of the "Halfway" real estate, sold after decedent's death, but said to be in fulfillment of decedent's intention.

Items Nos. 14 and 22 were loans made by the executors out of cash in bank at decedent's death—for Item No. 26 of the inventory and appraisement reads: "To amount of money in First National Bank of Hollidaysburg, Pa. at date of death of decedent, [$3156.93] less $600 loan to Annie and James G. Long to pay note they owed to Mr. Stewart, and less $400 loan to Medora

and Joseph Ritchey which sums are appraised ......
$2156.93."

The will dated June 7, 1910 and codicil dated January 2, 1911 were apparently written by the decedent, who was a sort of a country squire. They were unskillfully drawn, but for the purposes of this case it is enough to say that he gave his widow, Sarah Long, the right to remain in the homestead as long as she lived, together with the personal property in it. He authorized and empowered his executors to execute a deed or deeds for his real estate, of like force and effect as if the same had been executed by him during his lifetime. He appointed his three sons, "B. F., R. B., and I. F. Long executors or as a commity[1] to settle up my estate, collect all notes—rents and other moneys unpaid at my death—placeing the same in bank, or at any safe place until Edna J. Long my minor heir becomes of age (21 yrs.). No distribution to be made before the death of my wife Sarah Long, who is to be kept in comfort as long as she lives and remains my lawful widdow—after her death—equal Dis—to legal Heirs." There is nothing in the record to show just when Edna (now Mrs. Mobley, one of the appellants) came of age, but it was probably before January 2, 1918, when a distribution was made to the children, and could not have been later than June 7, 1931, so that at the widow's death the remaining estate was distributable. The direction to place the moneys in bank until Edna became of age, evidently was to apply in case the widow died before Edna. The funds certainly were to be invested during the widow's life for her benefit.

On April 11, 1913 a first and partial account was filed which was confirmed absolutely on June 24, 1913. This charged the executors with the amount of the inventory and with the receipt of interest, $224.25, making a total of $10,582.19, and asked for credits amount-

---

[1] Thus acting in the dual capacity of executors and trustees.

ing to $1746.99, leaving a balance of $9835.20. It contained a note, "That all other securities remain as shown by the Inventory and appraisement, except that R. B. Long paid the interest shown by said Inventory and Appraisement of $71.46."

On April 8, 1918, the second and partial account of the executors (prepared as of date of December 28, 1917) was filed, which was confirmed absolutely June 25, 1918. This account did not charge the executors with the balance of the first account, but itemized the debits—most of them being collections of notes, etc. (with interest), included in the inventory—aggregating $11,289.05, including $3.13 advanced by the executors to balance the account.[2] Among them were the following:

"Amount received from shares of stock of First National Bank [which had been appraised in Inventory at $400], $110.

"Amount on deposit First National Bank Hollidaysburg at date of death, March 16, 1912, $3156.93.

"Amount received, dividends on bank stock, First National Bank, $96."

Credit was taken for payments and investments of $7911.86, which included the loans to Medora and Joseph Ritchey of $400, and of Annie and J. G. Long of $600, thus corresponding, in effect, with the inventory as filed. The account also included a statement of the items in the inventory still in hand and uncollected, and some loans or investments made since the inventory, amounting together to $6685.81, of which $5566.94 was principal and $1118.87 was interest. Included among them were:

Note Medora Ritchey and Joseph
    Ritchey dated June 18, 1912 ..... $400.00
    Interest due December 28, 1917 ..   132.50   $532.50

---

[2] We give some details in explanation of certain objections made, without merit, in the court below.

Note of L. N. Long, dated September
   3, 1912 ...................... $1500.00
   Interest due December 28, 1917
   [after deducting $140 paid and
   debited in the account] .......... 334.93   1834.93

Note of Annie Long and James Long,
   dated June 1, 1912 .............. $600.00
   Interest due December 28, 1917 .. 200.70   800.70

Note [judgment] of J. M. Adams,
   dated March 27, 1916 ............ $500.00
   Interest due December 28, 1917 .. 26.00   526.00

Amount of stock in First National Bank .... 290.00

After adding these uncollected items to the cash receipts, the account showed a balance on hand of $10,063, of which $3377.19 represented cash and $6685.81 represented uncollected items.

A distribution of $700 to each of the children seems to have been made on January 2, 1918 (85a) except to L. N. Long, and his $700 was credited on his note above set forth.

Sarah Long, the widow, died May 26, 1933. On June 7, 1937, pursuant to a citation issued on the petition of one of the children, the executors filed their third and final account, charging themselves with $12,388.38 and taking credit with $13,378.04, and leaving a balance due them of $989.66.

Exceptions were filed on behalf of three of the children and an attaching creditor of a fourth, B. F. Long. An auditor was appointed on November 9, 1937 to pass upon the exceptions and report distribution, who after numerous hearings filed his report on November 7, 1938. Exceptions were filed to it and on June 16, 1939 the court remanded it to the auditor in order that a restated account might be filed.

On June 21, 1939 the restated account was filed. It charged the executors with the cash balance shown in the second account $3377.19 and embraced every uncollected item in the above list, aggregating $6685.81, and other items, amounting in all to $14,359.15. Included in this total, inter alia, were the J. M. Adams note of $500 supra, on which there had been collected money allocated to principal, $519.64 and interest, $331.81, or a total of $851.45; amount received from B. F. Long from sale of Llyswen lot, $400; amount charged for two shares of Hollidaysburg Trust Co. (formerly First National Bank) stock, $290; amount received in dividends from same, $20; "amount received from L. N. Long, balance of Halfway house, note dated Sept. 3, 1912, $1500. interest to December 28, 1917, $334.93, $1834.93."

The accounts took credit for $13,294.08, and showed a balance of $1064.07. Among the items of credit were, $6300 distributed to the children, $700 to each, except to L. N. Long; certain additional orphans' court costs paid; sheriff's costs paid on executions issued on (1) the J. M. Adams judgment and (2) the Samuel Burger mortgage; loss sustained on two shares Hollidaysburg Trust Company stock, $160 and for "Amount of L. N. Long note, debt ($1500) and interest ($334.93) $1834.93, less share $700, balance on note, worthless, $1134.93".

Numerous exceptions were filed on behalf of the excepting heirs and after further hearings the auditor made certain surcharges and restated the balance as follows:

Balance as shown by the Restated Third and
Final Account ................................. $1064.07
Surcharges: Costs of revival of judgment .... 9.50
           Orphans' Court costs .......... 12.80
           Costs ...................... 3.50
           Llyswen transaction .......... 200.00

Sale of Halfway Place ......... 2460.96
Note of James Long ........... 9.73

3759.56
Deduct Costs of auditor, etc. ........... 121.00

Net balance for distribution .............. $3638.56

Exceptions were filed by the executors and by the original exceptants.

An agreement as to facts was filed on March 25, 1940 (286a). Adopting this, the court cut down the surcharge on the sale of the Halfway Place to L. N. Long from $2460.96 to $1326.03, holding that interest should be allowed to the date of filing the third account, June 7, 1937. See agreement, p. 291a, par. 3. It added an additional surcharge of $4.50 for costs, and $72 for dividends on bank stock received and not accounted for, making a total balance of $2701.13, from which was deducted the costs of the original audit, $295.26, in addition to the costs of supplemental audit, already deducted, $121, leaving a balance for distribution of $2284.87, which it divided into ten primary shares, giving each such share $228.48 or $228.49.

The excepting heirs appealed. The executors did not appeal.

We shall not discuss all the matters raised by the exceptions and assignments of error. The exceptions were unnecessarily lengthy and many of the objections were trivial and unimportant. We have considered all of them, but shall discuss only the following:

(1) The third and final account of the executors was an insufficient and inadequate presentation of the account. Their counsel requested an opportunity to restate the account, but did not do so until after the auditor's report was filed and the court had referred it back for a restated account. This necessitated a supplemental audit. The executors should bear the

costs—including the auditor's fee, etc.—for this additional audit. They are surcharged with $121.

(2) While the decedent was accustomed to lend money on simple notes and judgment notes to his children and acquaintances, the executors had no authority to continue the practice. Hence when they sold the Halfway real estate to their brother, L. N. Long, for $1500, they should have taken a mortgage for the agreed purchase money. They took an interest bearing judgment note, but did not enter it. The purchaser paid $140 interest on account, but paid nothing further. At the time of filing the second account, the principal, $1500, and interest, $334.93, was due, a total of $1834.93. None of it was paid. When the distribution of $700 was made to each child on January 2, 1918, L. N. Long's $700 was credited on the note. The balance $1134.93 was a total loss. The investment was made by the executors and was illegal. They are responsible for the loss. The investment carried interest and they are responsible for the interest on the balance, after deducting L. N. Long's distributive share, $700, to the date of filing the account—not beyond it, for the securities should have been converted by that time. However, this makes no provision for the improper credit of $1134.93 in the account. This should be reduced to $700, the share to which L. N. Long was entitled. An additional surcharge of $434.93 is imposed.

(3) While the loan to J. M. Adams of $500 on his judgment note was an improper investment, nothing was lost because of it. If a legal mortgage had been taken instead of the judgment, the result would have been the same as respects the costs of selling the real estate at sheriff's sale. Principal and interest in full have been collected. The sheriff's costs, etc. on the execution were a proper item of credit.

(4) The Burger loan was on first mortgage. Counsel so admitted. The costs of foreclosing it were a proper item of credit.

(5) The auditor and the court surcharged the executors with $200 on the Llyswen lot transaction. This was a lot of ground which the executors conveyed to one of their number, B. F. Long, for $400, and which he re-sold to L. B. McDermott for $600, naming the consideration in the deed $1. Subsequently, in order to get a good title for McDermott, proceedings were had in the orphans' court ratifying and confirming the sale to McDermott at $400. The court was not informed at the time of the profit to B. F. Long on the resale. Nor does it appear that the other executors knew of it. B. F. Long, alone, seems to have derived the benefit from it. When first examined at the hearings before the auditor, he testified that $400 was all that McDermott paid. We think, in the circumstances, interest on the surcharge of $200 should have been added from the date of the deed to McDermott, May 18, 1920, to the date of filing the account, June 7, 1937, $204.60, just as was done in the L. N. Long Halfway transaction. As before stated, the will clearly contemplated the investment of the funds for the benefit of the widow. An additional surcharge of $204.60 is imposed. However, as B. F. Long alone benefited by the transaction, this additional surcharge, as well as the original surcharge of $200, making $404.60 in all is first chargeable against his share of the estate, and as this is less than the surcharge, the share coming to him will be applied by the executors as a set off to the surcharge, as far as it goes.

(6) The same order is made as to the share of L. N. Long. He is not entitled to be paid anything out of the surcharge on account of the loan to him. The share coming to him will be applied by the executors as a set off to the surcharge on account of his loan.

(7) In the circumstances disclosed by the evidence we are of opinion that the executors should not be surcharged further as respects the bank or trust company stock. As a matter of fact, they have accounted

for the stock at a valuation of $240, instead of $130, its present value. While it may have been their intention, as suggested by the auditor, to *claim a credit* of $110 in the second account for depreciation of the stock at that time, they actually did the opposite and *charged* themselves with $110. It is included in the cash balance of $3377.19 shown in that account, which was carried over as the first item in the Third and Restated Third Account, and forms part of the balance for distribution.

(8) The auditor and the lower court correctly disposed of the claim of the exceptants' and appellants' counsel (No. 190) to be paid a fee of $1000 out of the balance of the estate before distribution, thus asking the estate, rather than their clients, to pay the fees for their services.

The auditor and the court below relied on the principles enunciated in *Com. v. Order of Solon,* 193 Pa. 240, 44 A. 327, and *Harrison's Estate,* 221 Pa. 508, 70 A. 827; *Hempstead v. Meadville Theological School,* 286 Pa. 493, 134 A. 103; *Peoples-Pittsburgh Trust Co. v. Pittsburgh United Corporation,* 334 Pa. 107, 5 A. 2d 890. In the Order of Solon case, Mr. Justice DEAN speaking for the court said: "But it is urged that Mr. Quincy ...... induced the auditors to reject many thousand dollars of spurious claims on the fund, and thereby all holders of certificates ...... were benefited. Admit it; but he did only what he was bound to do under his professional obligation to his own clients; if he had done less, he would have failed in duty to them; in this particular he owed no duty to other claimants and performed none to them, although an incidental benefit may have resulted to them from the performance of a duty to his own clients. This, however, gives him no claim on them for contribution to his compensation" (p. 243-4). In *Harrison's Est.,* supra, the court distinguishing the case from *Kennedy's Est.,* 141 Pa. 479, 21 A. 671, where an allowance for counsel fees had been made to an *exceptant* out of the fund, said:

"In that case the allowance was only approved upon the peculiar facts stated in the opinion of the court below. And warning was expressly given that the action 'must not be drawn into a precedent for the broad doctrine that, where exceptions are filed to the account of an executor, administrator or trustee, in the orphans' court, the exceptant is entitled to an allowance for counsel fees out of the fund. The rule in such case is that the exceptant must pay his own counsel.' We regard this as a most salutary rule, and not to be entrenched upon or impaired in any way. To do so would be to open the door to great abuses. ...... The appellant was protecting her own interest, and although it may be that by means of her efforts others were benefited also, yet we know of no rule of law which will entitle her to be reimbursed for payment of counsel fees expended by her in order to protect her own interest. The services she rendered to the common interest were voluntary, and however beneficial they may have been, no legal charge for them can be sustained, in the absence of a contract of employment, either expressly made or superimposed as a matter of law or equity upon the facts." It will be noted that in that case the claim was made by the exceptant to the account for reimbursement of counsel fees *paid* by her. It nowhere appears in this case that the exceptants had paid their attorneys the $1000 fee demanded here.

The applicable principles are discussed at some length in *Hempstead v. Meadville Theological School,* supra; *Peoples-Pittsburgh Trust Co. v. Pittsburgh United Corp.,* supra; *Trasoff's Appeal,* 138 Pa. Superior Ct. 165, 9 A. 2d 922 [under title, In re *Tradesmen's Nat. Bank & Trust Co.*]; *Metropolitan Life Ins. Co. v. Doty,* 140 Pa. Superior Ct. 581, 587-8, 14 A. 2d 878; and *Mortgage B. & L. Association Case,* 334 Pa. 81, 101-103, 5 A. 2d 342, and, rightly understood, they sustain the action of the court below.

(9) We find no gross or wilful misconduct on the

part of the executors which should cause a forfeiture of their commissions. They managed the estate for twenty-seven years and were entitled to commissions of 5% on all the personalty of the decedent received, converted and disbursed by them, and the same percentage on all income received and disbursed by them during that period, and of 3% on the real estate sold and properly accounted for by them. While they continued to make investments as their father had done, we find nothing done by them which is not sufficiently dealt with by the surcharges imposed. The individual fault of B. F. Long should not cause the loss of the commissions to the executors.

(10) Costs. The costs were unnecessarily increased by the filing of numerous exceptions and objections, having no reasonable basis in law or fact, in addition to those sustained. For that reason we direct that each party shall pay the costs of printing his or her respective brief, and the costs of printing the record shall be divided equally between the appellants and the accountants.

The balance for distribution will be restated accordingly.

| | |
|---|---:|
| Balance as per order of court .............. | 2284.87 |

Add:

| | |
|---|---:|
| Supplemental auditor's costs ........ | 121.00 |
| Deduction from L. N. Long credit ..... | 434.93 |
| Surcharge of Interest on Llyswen lot | 204.60 |
| Total for distribution ............. | $3045.40 |

Primary share of each child, ..... $304.54

Payable to:

| | |
|---|---:|
| R. B. Long ................ | 304.54 |
| Ira F. Long ............... | 304.54 |
| James N. Long ............ | 304.54 |
| Sallie E. Ritchey .......... | 304.54 |

| | | |
|---|---|---|
| Minnie Ritchey .............. | 304.54 | |
| Edna Mobley ............... | 304.54 | |
| Ida L. Corl ................. | 304.54 | |
| Medora Ritchey's children [1/7 to each] ................. | 304.54 | 2436.32 |

Shares of L. N. Long and B. F. Long applied to surcharge ......................... 609.08

$3045.40

It is so ordered.